Frasers Group v. Morgan Stanley, 237635. Thank you. Mr. Rohn, you're reserved for one minute. Yes, please, Your Honor. Good morning, Your Honors. My name is Joseph Rohn from Sequoia Law. I'm here with my co-counsel Doug Kellner from Kellner, Hurley, Higuetti, and Friedman appearing on behalf of Appellant Frasers Group PLC. May it please the Court. This Court should reverse the lower court's complete denial of discovery, pursuant to Fraser's Section 1782 application, for two broad reasons. First, it misapplied the apex witness doctrine under the guise of the fourth intel factor. And second, it imposed an impermissible exhaustion requirement under the guise of the first and fourth intel factors. These are precisely the kinds of errors that an appellate court should review. Well, one of the things, I want to start earlier than that. Both of your briefs, when you're talking about the apex witness doctrine, cite to district court cases. Is there anything binding us on this idea of an apex witness? No, Your Honor. And in fact, the only appellate federal court that has looked into the issue and discussed the apex witness doctrine by name outright rejected it. And we would suggest that this court do the same. There's no real need for this doctrine, and it protects a class of people who likely are in the least need of protection from litigation. What do we do about the fact that the district court's invocation of the apex witness doctrine, at least as I read it, was subsidiary to its assessment of the intel factors? In other words, that they thought, when viewed as a whole, it disfavored Fraser's bid to depose Mr. Gordon? So the lower court suggests that it had a facially holistic view of the intel factors and of the facts. But in fact, the only findings that it makes regarding the deposition is that Mr. Gorman, the deposition target, is very busy. And therefore, it found under the apex witness doctrine, an impermissibly high standard of relevance of his testimony in order to deny the deposition in full. It only finds this under the fourth intel factor. And presumably, that is because the intel factor has a burden analysis. But being busy is not a permissible burden under the district court case law in this circuit that has discussed. Am I correct that you withdrew your, you at one point sought documents in Gorman's custody in the English proceedings, but later withdrew that? Is that correct? So this is actually an error that the lower court makes. The lower court suggests that there was some kind of formal application to the court. In fact, all that was done regarding Mr. Gorman's documents in the English case was that there was a request made to the parties for initial disclosure that included Mr. Gorman. And that was withdrawn pending further discovery in an iterative process. Didn't you want it? They did. But at the time, all they had were Mr. Gorman's public statements, which seemed to reflect his direct involvement. But you were asking for his public statements? No, we wanted more documents from him. You wanted what you wanted, but you withdrew that request. That's true. At the time, and then as we received more documents pointing to him and to his knowledge, that put not only his previous public statements into context. Why did you withdraw the request then in the English proceedings instead of filing a 1782? Because the documents that were produced to us pursuant to the English proceedings demonstrated that Mr. Gorman most likely had information that was not written down. So a document request alone would not be sufficient to fully understand the information that he had. And this is partly one of the purposes of 1782, to assist foreign courts, in particular to assist them with the kind of discovery that they're not able to order on their own. A deposition is not available under English procedure, and this is something that would assist the court in England to better understand the issues and motives for the decisions that were taken over there. Why isn't the Apex Doctrine firmly rooted in the fourth intel factor? That it's burdensome. I mean, you have scores of lawsuits internationally against big companies. If every one of them could come here and take the deposition of the chief operating officer or the CEO, it would be so invasive, it would be so burdensome, that they basically would decide to settle those cases and pay nuisance value. Should we become the instrument of the exaction of nuisance value, just because people choose to demand the attention and time of a senior official? Not only is there no danger of that in this case, where there is a record showing his specific knowledge, but in general, there's little danger of that because even without a special Apex Witness Doctrine, courts still are able to look at abuse and deny or limit discovery that they find abusive or inappropriate in some way under Rule 26. It's difficult to see why the Apex Witness Doctrine should expand Rule 26 in any way. And the courts that do thoroughly think about it, for instance, the Scott v. Cipolle decision, points out that the harm that you just mentioned, Judge Jacobs, is the purpose of the Apex Witness Doctrine, not some burden analysis from executives being busy. And that is not the analysis that the court had below. What would your response be that the assessments of knowledge that you suggest, so like edicts about senior management policies and knowledge of the internal policies, why is that enough to meet the unique personal knowledge about the margin call? So, taking a step back, that's first assuming that there's a unique personal knowledge requirement, which not all courts below have found for this. Assuming that is a requirement, these communications specifically refer to up the chain, top of the house, coming down from the CEO, up the tree and up the food chain to Morgan Stanley in New York. And for example, those are described in Appendix 116. Yeah, but that doesn't say Gorman though, right? There's a lot of people between the person who made the margin call and Gorman. Is that correct? We don't actually know because Morgan Stanley has not put in any other evidence of who those other people might be. And Mr. Gorman has injected himself into this by making those public statements at the beginning. And there is a reference to Mr. Gorman as the CEO, but top of the house seems to refer to him, he's CEO and chairman. So it seems like the most likely, the simplest and most straightforward way to get this information is simply to ask Mr. Gorman himself. And that alone is sufficient, even if he doesn't have unique knowledge. Because it is a two-part test and either part of those tests under lower court decisions would satisfy. What do you have to prove to win your English proceeding? I believe there are a number of claims there, but essentially it boils down to the idea that this was not market practice and the margin call at issue as well as the decision to maintain the margin call were irrational under business practices. And the chairman of Morgan Stanley sitting here in Midtown is going to be able to shed some reasonable light on that? Well, here's why. Because, as explained in the papers, the chairman of Morgan Stanley said he was specifically involved in overseeing risk management at the business unit that made those two key decisions. He's in charge of risk management firm, why? That's why he's called CEO. But he specifically stated himself that he's looking at this business unit because six weeks before these margin call decisions, he had to explain how they had a $1 billion overnight write down from the Archegos debacle. And having seen another $1 billion write down, which was already the biggest scandal that Morgan Stanley had seen in years, it is impossible to imagine he would go out in public making statements about the proper risk management of the very same business unit that just lost $1 billion without having some knowledge of what's going on. And remind me how much money is involved in that proceeding? So the margin call was for $1 billion. Our damages request is between $50 and $60 million in the UK. You referred to Rule 26 for the principle that the court can always control that. If discovery becomes unduly burdensome or expensive, and therefore can protect an apex. But that also says that we may not be entitled to discovery if it's obtainable from some other source that's more convenient, less burdensome, and less expensive. Why isn't that England? Because there's nowhere in the record making any of those findings that England would somehow be more convenient or less expensive. In fact, it wouldn't. And in particular, we would not be able to get a deposition there. Well, we're also talking about documents here. Yes, that's correct. And there's no evidence whatsoever in the record that England would be faster or more efficient, in fact. Well, don't you think it's more convenient to ask for it in England than to ask for it here? I mean, you have to take a plane trip and everything, and stay in hotels. Quite the opposite. The documents are here. So rather than going to England and trying to get MSIP, the English entity... It's easier to send documents to England than it is to send lawyers to America. Well, I mean, the American lawyers are already here. The major issue in England, and this was discussed in the briefing... No, I do see you're here. Thank you, Your Honor. The major issue with convenience that was discussed below, but no finding was made, is that the procedure for obtaining documents in England is more burdensome and slower and narrower than it is in the U.S. It is, by all accounts, less convenient than it is under U.S. discovery rules. Well, that's a very... That would seem to apply to every litigation in England. In many instances, it would. It probably also applies to every litigation in Germany and in France and Thailand as well. And that's partly what Section 1782 is meant to do. One of the purposes, the twin aims of Section 1782 are to provide efficient assistance for litigants in cases abroad as well as to encourage foreign courts to provide similar litigation. It's okay to seek documents first here because it's very cumbersome to seek them where your litigation is pending, where your arbitration is pending. That's perfectly acceptable, yes. And that is the purpose of 1782, one of its primary goals is to assist the efficiency in foreign courts. Unless there's some circumvention analysis, which there was not here, all parties agree there was no circumvention of what happened in England, there's no reason that we could not ask for those documents first here. Before you sit down, though, one question. You know, if I were the district judge, I might have given you all of these documents. I might have appreciated your presentation and whatnot. But Judge Inglemar saw things differently. How did he abuse his discretion? In other words, how is it that he made a decision that no sentient district court judge can make? Because misapplication of the wrong legal standard, which is reviewed de novo, is a violation of discretion. Sorry? What was his most, in your view, egregious error in that regard? So I think in the first one, his egregious error was to apply the wrong standard related to an apex witness, which is to impose some kind of presumed burden when there is no indication of any foul play or wrongdoing or harmful litigation tactics. He also imposed an exhaustion requirement. In this context, it wasn't the kind of common sense that in a litigation like this, you know, taking up the time of the chairman of Morgan, of this bank, was problematic. No, because there was an iterative process of discovery that led up to this. And that's exactly the kind of basis before so-called apex witness is to be deposed that lower courts have required. And then your second is that he inserted an exhaustion requirement. As to the documents. So tell me how this helps. What do we do if we don't consider the apex witness but then look at the other two? Are you resting on the exhaustion requirement? No. So if I understand the question, you're saying that if looking just at the exhaustion requirement and if that is overturned, what would be the result? No. My question is, there are two errors of law, you say. One is misapplication of the apex witness, which the first thing you said was it doesn't even apply here. So if we agree with you that it doesn't apply, which I don't know if we will, but if we agree with that, then you just have the exhaustion. The improper exhaustion. Is that right? Is there a third or another that I've not thought of? No, I think that is correct. That the second error is the exhaustion requirement. We did argue in our papers that there was clear error in his review of the facts and that even under an apex witness standard, the facts do show that we meet that standard. Thank you. What we keep calling an exhaustion requirement is what was called in the Malev airline case a quasi-exhaustion. What's the difference between an exhaustion requirement and a quasi-exhaustion requirement? A quasi? So I think they're ultimately the same thing. Quasi, quasi. Oh, no. I just wanted to make sure I heard you correctly. I'm sorry. Yeah, that's fine. I think ultimately they're the same thing. In Malev, I think they refer to quasi-exhaustion requirement because the district court did not say exhaustion. And that's something similar here where it's an exhaustion requirement in all but name. And courts after Malev have been consistent in agreeing that an exhaustion requirement, whether it's quasi or explicit, is not appropriate. This court has had to correct lower courts several times on that basis. And that's exactly, there's no way around that that's exactly what happened here. That's because the lower courts were assuming that if you could get the documents in Bangkok or in London, you should go first there. And that was his... And that's a mistake. And that was the only finding as to the documents that the lower court made below. The only finding it made was that these documents may be available in the English proceedings and therefore he dismissed the application with a suggestion to seek those documents there. That's it. That is an exhaustion requirement and it is a pure one in all but name. Thank you. Thank you. May it please the court. I'm Jeff Butler for Morgan Stanley and James Gorman. Judge Engelmeyer exercised his discretion in this case in exactly the way that intel and the prior cases of this court have instructed. He considered the intel factors and all the surrounding circumstances. He did not apply them mechanically. And he did not apply any extra statutory requirement or bright line rule to make his decision. Instead, he based his decision on a holistic appraisal of all the relevant factors. Now, the question before this court is whether that was an abuse of discretion. And let me address the two main arguments that Fraser makes. I'd like to start with the exhaustion requirement because there may be some confusion over this doctrine as it's developed in the court. Confusion on whose part? Our part or... No, really, I've noted it's on my part. It's kind of hard to sift through the cases dealing with this requirement. But what's important to understand, I think, is that the exhaustion requirement discussed in the Malev Hungarian Airlines case is a procedural requirement. The issue in that case was that the district court said that the Section 1782 discovery was premature because there had been no application made in the foreign court. And this court was reacting to that element of the decision. And the decision refers repeatedly to the requirement that you first seek the discovery in the foreign court before coming over here. And, of course, implicit in that is the idea that you first seek it and fail to get it in the foreign court before coming over here to seek it through Section 1782. In this case, we have a very different situation because Judge Engelmeyer didn't apply that kind of requirement. He merely considered, as one of the factors, that the discovery was equally available in England. And what other factor did he consider in connection with the documents? I think in connection with the documents he considered both the first and fourth factors significant, that if the discovery is available over there, it raises the question of whether there's any need to have it over here. It could be cumulative. You could consider it under a variety of Rule 26 factors, whether it's undue burden, whether it's proportional to the needs of the case, whether it's duplicative or cumulative, and whether the expense doesn't justify it. So I think the fourth, as far as the documents go, I think it's both the first factor and the fourth factor that Judge Engelmeyer found to be significant. Now what Frazes is arguing here is a much broader interpretation of Malev. They seem to want to argue that it's not relevant that the discovery is available overseas and that a foreign party should freely be able to seek it either in the foreign proceeding or over here through a 1782 petition. And my colleague, I think, said it was perfectly acceptable to pick and choose between the two forms. The problem with that expansive interpretation is it runs headlong into intel and the first intel factor which expressly authorizes district courts to consider whether the target of discovery is a participant in the foreign proceeding because if the discovery is available over there and within the jurisdiction of the court, there's less need to seek it over here. And I want to point out, it's also inconsistent with a statement made by this court in the In Re Mattelgesellschaft decision and I apologize if I'm butchering the German pronunciation there. In that case, the court expressly described the situation. There it was talking about the discoverability requirement of the foreign court but it expressly noted that it would be appropriate to consider if the discovery was equally available in the foreign court as it's available over here because that raises the issue of whether the discovery is duplicative and whether the discovery application here might be brought vexatiously. So again, the broad... Have you at any point though identified any lower ranking MSIP personnel who participated in the margin call? How is Frazier supposed to know who to seek discovery from? Yes, the persons involved in the margin call decision were fully disclosed in the English proceeding and there were witness statements presented from at least some of those individuals. So there was plenty of information and we argued to Judge they have already had the opportunity to take full discovery of the decision makers of that margin call. After the fact there was discussion but also Mr. Gorman was not involved in those discussions about potentially settling the issue with Frazier's but the margin call was made by individuals in England who were responsible for credit risk given the situation and the position that had been amassed by not Frazier's directly but by Saxo Bank, the intermediary. What substantive effect would it have in your opinion on the outcome of the British proceedings if the decision was made by Mr. Gorman instead of by the people on the ground? Well, hypothetically if the decision had been made by Mr. Gorman then his testimony would be much more relevant because the issue as I understand it over there in England is whether that... That is what they're saying. They're saying that it was made by him to avoid another embarrassing kind of default that he had just experienced a few weeks earlier. That's not what the evidence considered by Judge Inglemeyer showed. The evidence showed that he was not involved in the decision but the decision may have been influenced by things he had said in the past or by general policies within Morgan Stanley. And whether that... The decision makers were influenced by those things, you can certainly learn that from the decision makers themselves. You don't have to go to the originator of the policy in order to learn that information. Would it matter if the margin call on Frazer's was made on the basis of that your adversaries are alleging rather than on the basis that Frazer's may be in financial trouble? Would it be relevant in the English proceeding? I think so. I'm not an expert but if it was based on... It would tend to make it more arbitrary, wouldn't it? It might be considered more arbitrary if it was based on an arbitrary factor, Your Honor, certainly. But that wouldn't bring Mr. Gorman into the picture as a decision maker with respect to the margin call or the decision to maintain the margin call. So, unless there are further questions, thank you very much, Your Honors. Mr. Romney, you've got one minute. Thank you, Your Honors. I'm going to try and make three very quick points. First, Judge Jacobs, your question suggesting that we argued that Mr. Gorman made the decisions, that's not quite right and I just want to clarify that. I think he influenced it. He definitely influenced it with his policies and the people that MSIP in England have said made the decisions. We have documents from them all saying, it's not my decision, I'm just following instructions from up above, from the top of the House. Second, they said that there's some confusion as to the first intel factor. That's true. The lower courts have confused the first intel factors language and have suggested that the first intel factor is whether or not documents are available abroad. That's not the language of the first intel factor. It's about whether or not the foreign court can enforce against persons who are located within its jurisdiction and that's a key decision because if it was just to look at whether documents were available abroad, that would be encouraging the exhaustion requirement. And then finally they suggested that there was a holistic appraisal below of all relevant factors. That's not supported in the record. The lower court found that Mr. Gorman was a very busy executive and that these documents were available abroad and despite lip service to all of the factors and facts before him, those were the only bases upon which he made his decision. Thank you, Your Honors. Thank you. Okay, that concludes the argument on the appeals calendar today.